UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEMETRIUS WILLIAMS
and JOHN K. PATTERSON,

                    Plaintiffs,

            v.                                    Case No. 19-cv-56-pp

ERIK H. MICHALSEN
and ERIC J. SEVERSON,

                    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 67) AND DISMISSING CASE

In 2019, the plaintiffs filed a complaint alleging that the defendants violated their Fourth and Fourteenth Amendment rights when defendant Erik H. Michalsen interacted with the plaintiffs as their vehicle sat incapacitated on the shoulder of the interstate. Dkt. No. 1. In June 2020, the plaintiffs filed an amended complaint, which now is the operative complaint. Flanner v. Recording Indus. Ass'n of Am., 354 F.3d 632, 638 n.1 (7th Cir. 2004) ("It is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void."). Dkt. No. 43. The defendants have filed a motion for summary judgment, which has been fully briefed for some time. The court will grant the defendants' motion for summary judgment and dismiss the case.

1

## I.     Factual Background

In their brief in support of their motion for summary judgment, the defendants concede that each of the parties involved in the incident that gave rise to this suit—each of the plaintiffs and defendant Michalsen—remember small details differently. Dkt. No. 68 at 4. They acknowledge that there are "slight but immaterial discrepancies between various documents created as a result of the encounter . . . ." Id. at 5. But they argue that none of the discrepancies are material to the claims or the summary judgment arguments. Id. The plaintiffs did not respond directly to these statements, although they assert in their opposition brief that there are

> genuine disputes of material fact regarding (1) whether plaintiffs consented to give Deputy Michalsen their driver's licenses; and (2) the training Deputy Michalsen received regarding (a) the circumstances under which sheriff's deputies ask citizens for identification, and the presence of alcohol, drugs and guns; and (b) the circumstances under which deputies run outstanding warrant checks on individuals.

Dkt. No. 76 at 2.

On May 1, 2018, plaintiffs William Patterson and Demetrius Williams, both African American residents of Milwaukee, went fishing on the Rock River in Jefferson, Wisconsin. Dkt. No. 78 at ¶¶1-2. Heading back to Milwaukee, Patterson was driving a truck towing his fishing boat; he was driving in the left lane of eastbound I-94 in eastern Waukesha County with Williams sitting in the front passenger seat. Id. at ¶¶4-7. As the plaintiffs traveled eastbound on I-94, the driver's side rear tire on the boat "went flat," requiring Patterson to pull over to the right shoulder of the interstate, out of traffic. Id. at ¶¶10-11.

2

Patterson activated emergency flashers and maneuvered through some orange construction barrels on the side of the road, getting over as far as he could on the right shoulder to be clear of traffic. Id. at ¶11. Once he had stopped on the shoulder, Patterson called his insurance company, who told him it would send a tow truck in forty-five minutes to an hour. Id. at ¶12. The plaintiffs' plan was to stay and wait for the tow truck to arrive; they didn't plan to have anyone pick them up or to walk anywhere for assistance. Id. at ¶14.

The parties agree that the Waukesha County Sheriff's Office (WCSO) had a policy requiring sheriff's deputies to stop "for all disabled vehicles unless an orange tab has been affixed to the vehicle or exigent circumstances dictate otherwise." Id. at ¶16. After ten or fifteen minutes, a WCSO squad car pulled up behind the plaintiffs with its lights activated. Id. at ¶15. Defendant Deputy Erik Michalsen was driving the squad car; as he pulled up, he notified dispatch that there was a truck with a boat and trailer on the shoulder out of traffic, and that the trailer had a flat tire. Dkt. No. 80 at ¶12. Patterson saw Michalsen step out of the squad car and approach the truck.[1] Dkt. No. 78 at ¶17. The parties agree that neither before nor during their interaction with Michalsen did either plaintiff get out of the truck. Id. at ¶18. A second WCSO officer, defendant Deputy Michael Powell, was in the passenger seat of the squad car; he did not leave the squad car during the incident, could not see Michalsen's

_____

[1] The parties appear to dispute whether Michalsen approached the driver's side of the truck or the passenger side. Dkt. Nos. 78 at ¶17; 80 at ¶13. This dispute is immaterial.

interactions with the plaintiffs and did not see the plaintiffs. Id. at ¶¶19-21. Powell was Michalsen's field training officer (supervisor) that day. Id. at ¶79.

When Michalsen arrived at the driver's side door of Patterson's truck, Patterson rolled down his window. Id. at ¶22. The parties do not dispute that Michalsen's first words to Patterson were something like "Let me see your driver's license" or "I need to see your driver's license." Id. at ¶23. Michalsen also asked the plaintiffs if they had called for a squad, to which Patterson responded that he hadn't, but that he'd called his insurance company and that the insurance company was sending a tow truck. Dkt. Nos. 78 at ¶25; 80 at ¶¶15-16.

The parties appear to agree that when Michalsen asked Patterson for his driver's license, Patterson complied and handed Michalsen the license, but the plaintiffs assert that Patterson felt Michalsen's request was "out of order." Dkt. No. 78 at ¶24. The plaintiffs assert that Patterson turned over the license because he felt he had no choice and because he needed to get home and did not want to escalate the situation. Id.

Patterson also asked whether Michalsen needed to see his insurance card; Michalsen responded, "No. I don't need to see your insurance card. This will suffice. This is all right." Id. at ¶¶25-26. Michalsen then asked whether the plaintiffs had drugs, firearms or alcohol in the truck, and Patterson responded, "No, we don't." Id. at ¶27.

Williams's testimony as to the chronology of the plaintiffs' interaction with Michalsen up to this point differs slightly from Patterson's. Id. at ¶28.

4

Williams testified at his deposition that Michalsen first asked, "Are you the guys that called for a squad?" Id. Williams testified that to his recollection, Patterson responded, "No." Id. at ¶29. Williams testified that he recalled Patterson then telling Michalsen that Patterson had just called his insurer and that the insurer was sending a tow truck. Id. at ¶30. Williams testified that Michalsen then asked whether the plaintiffs had guns, drugs or alcohol in the car, to which Williams responded, "We are pastors. I'm a university professor. We don't have any of that in the car." Id. at ¶¶32-33. According to Williams's recollection, it was at that point that Michalsen said to Patterson, "We need your license;" Williams testified that Patterson responded, "Okay. Well, here you go." Id. at ¶¶34-35.

The parties do not dispute that at this point, Michalsen turned to Williams (who was in the passenger seat) and said something like either "I need to see your driver's license as well" or "I need yours too." Dkt. Nos. 78 at ¶36; 80 at ¶20. Williams asked why Michalsen needed to see his driver's license. Dkt. No. 78 at ¶¶37-38. Michalsen walked over to Williams's side of the vehicle and repeated that he needed Williams's license. Id. at ¶43. Although the parties' versions of the exchange between Michalsen and Williams differ, both agree that during the exchange, Michalsen said, "It's our policy." Dkt. Nos. 78 at ¶45; 80 at ¶23. Williams asked Michalsen what kind of policy would require him to provide his license.[2] Dkt. Nos. 78 at ¶46; 80 at ¶24. Michalsen

---

[2] The parties recount different versions of what Williams said—the defendants say that he said, "What policy is that that you would need my license?", dkt. no. 78 at ¶46, while the plaintiffs recount that he said, "What kind of policy is

responded to the effect that his supervisor was in the squad car so he was required to get Williams's license. Dkt. No. 78 at ¶¶40, 47. Williams gave Michelsen his license, saying, "I don't agree with this, this is wrong, so I give you this in protest." Id. at ¶48.

Michalsen took the plaintiffs' licenses to the squad car and conducted a warrant search. Dkt. No. 80 at ¶30. About fifteen minutes later, Michalsen returned to the driver's side of the truck and returned both licenses without saying anything. Dkt. No. 78 at ¶59. Williams testified at deposition that when Michalsen returned with the licenses, Michalsen had a "yellow sticker."[3] Id. at ¶61. Williams testified that Patterson asked what Michalsen planned to do with the sticker; Michalsen he was going to "put it on." Id. at ¶¶62-63. Williams testified that Patterson asked why Michalsen would do that and stated that it was hard to remove such stickers; Williams testified that Michalsen responded that he would "put it on softly." Id. at ¶¶64-65. Michalsen applied the sticker to the boat, then left. Id. at ¶¶60, 66. The parties do not dispute that it is standard procedure for WCSO deputies to place a sticker on a disabled vehicle—regardless of whether help is on the way—to let other passing police officers know that someone has checked on the vehicle. Id. at ¶¶84-85. The

---

that that you just discriminately request someone's license?", dkt. no. 80 at ¶24. Neither party disputes the other's version of Williams's statement; the dispute appears immaterial.

[3] It is not clear whether the sticker was yellow or orange; some proposed findings refer to the color as orange, but Williams testified that it was yellow.

plaintiffs dispute only that the placement of a sticker occurs in all cases. Id. at ¶84.

The parties do not dispute that on the date of the incident, Michalsen was wearing a standard law enforcement uniform, never displayed a weapon, never made physical contact with either plaintiff and did not knock on the vehicle's windows when he reached Patterson's truck. Id. at ¶¶55-58. They do not dispute that Michalsen never asked the plaintiffs whether they needed help. Dkt. No. 80 at ¶34. The tow truck arrived after the deputies had left. Dkt. No. 78 at ¶67. Michalsen and Powell logged their contact with the plaintiffs as a disabled vehicle on I-94, not as a traffic violation. Id. at ¶¶68-69.

Neither plaintiff had met Michalsen before the May 1, 2018 incident. Id. at ¶76. Michalsen started employment with the WCSO on January 29, 2018 and on May 1, 2018 still was completing field training. Id. at ¶77. Patterson and Williams are African American and Michalsen is Caucasian. Dkt. No. 80 at ¶4.

In their separate proposed findings of fact, the plaintiffs stated that Susan Herro is a Caucasian attorney "whose vehicle became disabled due to a spin-out on ice in I-94 and Highway 67 in Waukesha County prior to 2018." Id. at ¶70 (the defendants clarify that the spin-out happened in February 2003). The parties agree that Herro called a tow truck and that while she was waiting for the tow truck to come, a WCSO deputy stopped. Id. at ¶71. The parties agree that the deputy who stopped was Caucasian, that he asked Herro if she was hurt or if she was okay and that he asked Herro if she wanted to wait in

7

the warm, back seat of the squad until the tow truck arrived. Id. at ¶72. It is undisputed that the deputy did not ask Herro whether she had a weapon, drugs or alcohol. Id. at ¶73. It is undisputed that the deputy "did not ask Susan Herro for her name, address, driver's license or other proof of identification and did not run her identification for a warrants check." Id. at ¶74. In Herro's presence, the deputy did not put a sticker on her car and the deputy left before the tow truck arrived. Id. at ¶75. Herro apparently read in the media a statement from defendant Severson in which Severson said that the treatment of the plaintiffs in this case was not motivated by race; Herro wrote Severson and disagreed. Id. at ¶¶77-78.

## II.     Procedural Background

The plaintiffs filed their complaint in January 2019, naming as defendants Erik Michalsen, Michael Powell and Waukesha County. Dkt. No. 1. In lieu of an answer, the defendants filed a motion to dismiss. Dkt. No. 10. After the parties had fully briefed that motion, the court held a hearing. Dkt. No. 40. At that hearing, the court advised the parties that it was going to deny the motion to dismiss the equal protection claim, but was going to grant the motion to dismiss the Fourth Amendment claim and to dismiss Waukesha County as a defendant. Id. It advised the parties that it would issue a more detailed order, and it gave the plaintiffs a deadline of June 12, 2020 by which to file an amended complaint. Id.

In its more detailed order, the court opined that the plaintiffs were bringing a "class-of-one" equal protection claim under the Fourteenth

Amendment. Dkt. No. 41 at 7. It found that they had alleged sufficient facts to raise such a claim. Id. at 8. The court found it possible that the plaintiffs also were trying to bring a racial profiling claim. Id. The court acknowledged that the plaintiffs had pled some facts that would support such a claim, but found it "thin on some" other facts. Id. at 9. Nonetheless, the court found that for the purposes of the motion to dismiss, the plaintiffs had stated enough to proceed on an equal protection claim—"at the very least, a class-of-one claim." Id. As for the plaintiffs' Fourth Amendment claim, however, the court found that "the plaintiffs have pointed to no authority that provides a civil cause of action for unconstitutional stop or seizure in a case where officers asked for a license, asked about guns and drugs or ran a warrant check." Id. at 15. The court said it would allow the plaintiffs to amend the complaint to try to state a Fourth Amendment claim. Id. Because the court could not determine whether a stop or seizure occurred, it could not determine whether (as the defendants had argued) they were performing their community caretaker function when they engaged in the complained-of conduct. Id. at 18-19. And the court dismissed Waukesha County as a defendant because the plaintiffs had not alleged any wrongdoing against it. Id. at 41.

On May 4, 2020, the defendants filed an answer to the complaint. Dkt. No. 42. But on June 12, 2020, the plaintiffs filed an amended complaint. Dkt. No. 43. The amended complaint named Michalsen, Powell and Erik H. Severson in his official capacity as the Waukesha County sheriff. Id. at 1. Count One of the amended complaint alleged "Racial Profiling," described as a "Violation of

the Fourteenth Amendment's Equal Protection Clause Against Deputies Michalsen and Powell." Id. at 8. Count Two alleged "Class-Of-One," described as a "Violation of the Fourteenth Amendment's Equal Protection Clause Against Deputies Michalsen and Powell." Id. at 9. Count Three alleged "Unreasonable Seizures," described as "Violation of Fourth Amendment Against Deputies Michalsen and Powell." Id. at 11. This count asserted that Michalsen and Powell "unlawfully transformed a disabled vehicle encounter into an unlawful stop by asking Plaintiffs about guns and drugs, compelling the production of Plaintiffs' driver's licenses and running warrants checks, all absent any reasonable suspicion of crime," and that Michalsen prolonged the stop by asking the plaintiffs about guns and drugs, demanding their licenses and holding their licenses while performing warrant checks. Id. at ¶¶66-67. Count Four alleged "Unreasonable Searches," described as "Violation of Fourth Amendment Against Deputies Michalsen and Powell." Id. at 13. This count asserted that Michalsen and Powell had "compelled"—and, allegedly, thus searched—the plaintiffs' drivers' licenses and their "protected driver information for no legitimate law enforcement function." Id. at ¶80. Count Five sought prospective injunctive relief compelling defendant Severson to "implement and enforce constitutional policies and programs with respect to training, supervision, monitoring, and discipline that will eliminate suspicion-less searches and seizures and eliminate racial profiling by the defendant deputies and others." Id. at ¶88.

10

The defendants answered the amended complaint on June 26, 2020. Dkt. No. 45. The parties amended the scheduling order several times between June 2020 and May 2022. On May 24, 2022, the parties filed a stipulation dismissing Powell as a defendant. Dkt. No. 65. On August 1, 2022, remaining defendants Michalsen and Severson filed the instant motion for summary judgment. Dkt. No. 67. The plaintiffs filed their opposition materials on August 31, 2022, dkt. no. 78, and the defendants filed their reply on September 14, 2022, dkt. no. 79.

## III. Summary Judgment Standard

A party is entitled to summary judgment if the party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original)). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

11

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [their] favor." <u>Fitzgerald v. Santoro</u>, 707 F.3d 725, 730 (7th Cir. 2013) (quoting <u>Makowski v. SmithAmundsen LLC</u>, 662 F.3d 818, 822 (7th Cir. 2011)). Summary judgment is the proverbial "put up or shut up" moment in a lawsuit "when a party must show what evidence it has that would convince a trier of fact to accept its version of events." <u>Johnson v. Cambridge Indus., Inc.</u>, 325 F.3d 892, 901 (7th Cir. 2003).

"To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." <u>See</u> <u>Heft v. Moore</u>, 351 F.3d 278, 282 (7th Cir. 2003) (citing <u>Anderson</u>, 477 U.S. at 255). "However, favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." <u>Fitzgerald</u>, 707 F.3d at 730 (quoting <u>Harper v. C.R. Eng., Inc.</u>, 687 F.3d 297, 306 (7th Cir. 2012)). "A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact" and "a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." <u>Smith v. Lamz</u>, 321 F.3d 680, 683 (7th Cir. 2003) (internal quotations and citations omitted).

At summary judgment, the court may "not weigh credibility, balance the relative weight of conflicting evidence, choose between competing inferences, or

resolve swearing contests." Flowers v. Renfro, 46 F.4th 631, 636 (7th Cir. 2022); see also Berry v. Chi. Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders.").

## IV. Analysis

### A. Equal Protection Claims

#### 1. *How the Parties Analyzed the Two Equal Protection Claims*

"The Equal Protection Clause of the Fourteenth Amendment, ratified to help protect the equality that had been won in the Civil War, is most familiar as a guard against state and local government discrimination on the basis of race, national origin, sex, and other class-based distinctions." FKFJ, Inc. v. Village of Worth, 11 F.4th 574, 588 (7th Cir. 2021) (quoting Geinosky v. City of Chicago, 675 F.3d 743, 747 (7th Cir. 2012)). "The Equal Protection Clause requires a 'rational reason' for disparate treatment of those who are similarly situated." Id. (citing Enquist v. Oregon Dep't of Agric., 553 U.S. 591, 602 (2008)).

Law enforcement can violate the Equal Protection Clause by using "impermissible racial classifications in determining whom to stop, detain, and search." Chavez v. Ill. State Police, 251 F.3d 612, 635 (7th Cir. 2001). This kind of "selective enforcement of the law based on considerations such as race" is a form of equal protection violation known as "racial profiling." Id. (quoting Whren v. United States, 517 U.S. 806, 813 (1996)).

The Equal Protection Clause "also protects persons 'against purely arbitrary government classifications, even when a classification consists of

13

singling out just one person for different treatment for arbitrary and irrational purposes.'" FKFJ, Inc., 11 F.4th at 588 (quoting Geinosky, 675 F.3d at 747). This is what's known as a "class-of-one" equal protection claim. Id. A plaintiff may bring a "class-of-one" equal protection claim against any state actor—law enforcement or otherwise—who singles out that plaintiff for different treatment for arbitrary and irrational reasons.

As the court has explained, in the amended complaint, the plaintiffs alleged *both* "racial profiling" and "class-of-one" claims. Count One—the claim titled "Racial Profiling"—alleges:

> 43.     Plaintiffs are members of a protected class because they are African Americans.
>
> 44.     White persons who were approached by Waukesha County sheriff's deputies while waiting on the side of the road for assistance with a flat tire were not asked about guns or drugs, compelled to produce their driver's licenses or warrant checked or otherwise treated as they were criminals.
>
> 45.     Deputies Michalsen and Powell treated Plaintiffs differently from white persons because they are African Americans.
>
> 46.     As a result of Deputies Michalsen and Powell's unlawful conduct, Plaintiffs sustained damages, including, among others, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

Dkt. No. 43 at ¶¶43-46.

> Count Two—the claim titled "Class-of-One"—alleges:
>
> 48.     Deputies Michalsen and Powell approached Plaintiffs' vehicle because it was disabled on the highway.
>
> 49.     Instead of treating the encounter as a disabled vehicle per Waukesha County policy, Deputies Michalsen and Powell treated the encounter as a traffic stop with a reasonable suspicion of a crime

14

by questioning the Plaintiffs about guns and drugs, compelling the production of their driver's licenses and running warrants checks.

50. The treatment the Plaintiffs received from Deputies Michalsen and Powell in response to their vehicle being disabled differs qualitatively from the treatment of similarly situated white individuals.

51. Deputies Michalsen and Powell treated the encounter as a traffic stop with a reasonable suspicion of a crime because of Plaintiffs' race.

52. At the time of the events complained of herein, Plaintiffs had the clearly established constitutional right to enjoy equal protection of the laws and to be free from Deputy Michalsen's discrimination based on race and ordered or condoned or ratified by Deputy Powell.

53. Plaintiffs also had the clearly established constitutional right to enjoy the equal protection of the laws and to be free from intentional discrimination in the form of arbitrary and irrational treatment that differs from the treatment of similarly situated individuals.

54. Any reasonable law enforcement officer knew or should have known of these clearly established rights.

55. Plaintiffs' race was a motivating factor in Deputies Michalsen and Powell's decision to target Plaintiffs.

56. Deputies Michalsen and Powell's conduct was undertaken with the purpose of, and had the effect of, depriving Plaintiffs of the equal protection and benefits of the law and equal privileges and immunities under the law.

57. Deputies Michalsen and Powell treated Plaintiffs less favorably than similarly situated while persons.

58. Deputies Michalsen and Powell's actions were objectively unreasonable and/or racist in light of the facts and circumstances confronting them.

59. There was no rational basis for Deputies Michelsen and Powell's discriminatory actions, let alone a purpose narrowly tailored to serve a compelling government interest.

60.     Deputies Michalsen and Powell intentionally, willfully, and wantonly targeted Plaintiffs because of their racial identity and they unlawfully treated them less favorably than individuals who were similarly situated in every material respect.

61.     Deputies Michalsen and Powell's differential treatment was wholly arbitrary and irrational and unconstitutional.

62.     As a result of Deputies Michalsen and Powell's unlawful conduct, Plaintiffs sustained damages, including, among others, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment [of] life, and other nonpecuniary losses.

Id. at ¶¶48-62.

Although the amended complaint alleged separate racial profiling and class-of-one claims, in their brief in support of summary judgment, the defendants state that "[f]or all intents and purposes, the analysis applicable to Plaintiffs' class-of-one claim is identical to that of Plaintiffs' racial profiling claim." Dkt. No. 68 at 15. And although the plaintiffs chose to bring separate racial profiling and class-of-one claims in the amended complaint, in their brief in opposition to the defendants' motion for summary judgment, they drop a footnote in which they state that "[b]ecause the standard and proof required for a 'class of one' claim is similar to the 'discriminatory effect' portion of a challenge to police conduct based on a racial profiling claim, the two types of equal protection claims are not addressed separately." Dkt. No. 76 at 14 n.11. In their reply brief, the defendants appear to adopt the plaintiffs' approach, stating, "As with Plaintiffs, Defendants will address both the racial profiling and class-of-one equal protection claims without distinction." Dkt. No. 79 at 1 n.1.

As the court will explain, the court disagrees with the parties' conflation of the analyses applicable to the two claims.

### 2. *The Parties' Arguments*

#### a. The Defendants' Arguments

##### i. **Racial profiling**

The defendants begin with the racial profiling claim alleged in Count One of the amended complaint. Dkt. No. 68 at 4. They assert that to show an equal protection violation based on racial profiling, the plaintiffs must prove that the defendants' acts had a discriminatory effect and that they were motivated by a discriminatory purposes, citing <u>Chavez</u>, 251 F.3d at 635-636 . <u>Id.</u> at 5.

The defendants maintain that to prove the first element—discriminatory effect—the plaintiffs must show that they "are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." <u>Id.</u> at 5-6 (citing <u>Chavez</u>, 251 F.3d at 636). The defendants do not dispute that the plaintiffs are members of a protected class. <u>Id.</u> at 6.

The defendants say that "[t]he focus then shifts to Plaintiffs' proffered comparator, Susan Herro." <u>Id.</u> Presumably the defendants make this shift in focus to address the questions raised by the second element—whether the plaintiffs were otherwise similarly situated to members of an unprotected class and whether they were treated differently from members of the unprotected class. The defendants explain:

> To determine whether Ms. Herro was actually similarly situated to Plaintiffs, the Court must look at all relevant factors, "the number

17

of which depends on the context of the case." *Chavez*, 251 F.3d at 636. This Court previously provided some factors for consideration:

> Who was the deputy involved in the Herro encounter? How long before the plaintiffs' incident did the Herro encounter occur? What were the circumstances under which Herro was stopped at the roadside? Are the plaintiffs alleging that these individual defendants have engaged in a pattern of treating disabled vehicle stops involving persons of color differently than they do disabled vehicle stops involving white people? Did the defendants in this case say anything about the plaintiff's race?

> (Dkt. No. 41, p. 9.)

Id.

The defendants argue that the answers to all these questions show that Herro is not "otherwise similarly situated" to the plaintiffs. Id. They assert that Herro's encounter occurred more than fifteen years before the plaintiffs' encounter with Michalsen. Id. They argue that the deputy in Herro's encounter could not have been Michalsen (who started with WCSO in 2018). Id. at 6-7. They argue that Herro was not stopped on the road's shoulder but was "stranded on a median at the end of an icy exit ramp." Id. at 7. They argue that the deputy who stopped for Herro "ultimately had to leave before the tow truck arrived due to exigent circumstances, so there is no way to know how that interaction would have concluded had circumstances allowed it to play out." Id. Finally, they argue that in this case, there is no evidence that Michalsen said anything about the plaintiffs' race. Id.

Observing that the amended complaint references the "statistical racial makeup of Waukesha County," the defendants argue that although statistics sometimes "may support a finding of discriminatory effect," they would be

18

"entirely useless" in this case because Michalsen did not stop the plaintiffs (they already were stopped due to the flat tire) and did not cite them. Id. at 7. The defendants maintain that the plaintiffs "take issue with the type of mundane logistics inherent in all encounters between citizens and law enforcement, and they base their claims on their own subjective interpretation of Deputy Michalsen's otherwise neutral behavior." Id. at 7-8 (record citations omitted). They assert that WCSO deputies are "not allowed to provide repairs to stranded motorists, change tires, jump batteries, etc." and that deputies cannot use department vehicles to tow or jump-start disabled vehicles; they say that given this, "it is unclear what Deputy Michalsen could have done to help Plaintiffs considering a tow truck was already on the way." Id. at 8. And they contend that, to the extent the plaintiffs are complaining that Michalsen was rude during the encounter, being rude or inconsiderate does not constitute an equal protection violation. Id. at 8-9.

The defendants argue that even if the plaintiffs can show that their actions had a discriminatory effect, they cannot show that the actions had a discriminatory purpose. Id. at 9. They contend that there is no evidence that Michalsen's questions about guns or drugs in the car, his request for the plaintiffs' licenses, his running of warrant checks or his tagging of the boat were racially motivated or had a discriminatory purpose. Id. at 9-10. They say that Michalsen asked for the plaintiffs' licenses because his supervisor was in the squad car, and because he's required by department policy to identify anyone with whom he comes into contact. Id. at 10. They maintain that

19

Michalsen was trained to ask for identification, not to ask simply for names. Id. at 10-11. And the defendants assert that Michalsen (and Powell) have testified that if they ask someone for a license and the person declines, Michalsen would not require the license and would move on (although the defendants identify no evidence showing that the *plaintiffs* were aware of this fact). Id. at 11.

As for Michalsen's questions about guns or drugs in the vehicle, the defendants say that WCSO deputies are trained to ask these questions "during every encounter," for officer safety. Id. at 11-12. They say that the plaintiffs had no right to be treated differently just because they are pastors. Id. And the defendants explain the events that gave rise to the practice of WCSO deputies asking about guns and drugs—the increased confiscation of drugs and weapons from vehicles on I-94 and I-43, the law allowing concealed carry and an increase in opioid abuse. Id. at 12. The defendants assert that there are several reasons for running a warrant check—determining whether the person is missing or endangered, determining whether the person has a history of law enforcement contacts (and whether the person might pose a threat to an officer) and determining the risk that a person might be armed. Id. at 13. They argue that WCSO's standard practice for all contacts, "regardless of race and regardless of whether the encounter is the result of a traffic stop or a disabled vehicle," is to run a warrant check. Id. at 13-14.

Finally, the defendants assert that WCSO deputies are trained to tag all disabled vehicles, "regardless of whether a tow truck has been called or help is

on the way." Id. at 14. They explain that the tag "lets any other passing law enforcement officers from any agency know that someone has been out to check on the vehicle." Id. And they say that the fact that someone has called a tow truck doesn't mean it will arrive any time soon. Id.

### ii. **Class-of-one claim**

As explained above, the defendants assert that "[f]or all intents and purposes, the analysis applicable to Plaintiffs' class-of-one claim is identical to that of Plaintiffs' racial profiling claim." Id. at 15. They maintain that the plaintiffs must show "that they were intentionally treated differently from others similarly situated and that there was no rational basis for such difference in treatment." Id. (citing United States v. Moore, 543 F.3d 891, 896 (7th Cir. 2008). The defendants reiterate that the plaintiffs have not identified an individual similarly situated to them, and they argue that even if the plaintiffs had identified a similarly situated person, they cannot show that Michalsen intentionally treated them differently without any rational basis. Id. (citations omitted).

### b. The Plaintiffs' Responses

Unlike the defendants, the plaintiffs did not break their equal protection arguments down into racial profiling arguments and class-of-one arguments—even though it was the *plaintiffs* who chose to bring separate racial profiling and class-of-one claims in the amended complaint. In a footnote in their brief, the plaintiffs acknowledge having brought the separate claims. Dkt. No. 76 at 14 n.11. They then stated:

One way of establishing a "class of one" equal protection claim is for the plaintiff to show that he was treated differently from others similarly situated, and that there was no rational basis for the treatment. *See Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002). Because the standard and proof required for a "class of one" claim is similar to the "discriminatory effect" portion of a challenge to police conduct based on a racial profiling claim, the two types of equal protection claims are not addressed separately.

Id.

The plaintiffs emphasize that the defendants have acknowledged that they are members of a protected class, so the plaintiffs assert that they have only "to show that they were treated differently from other similarly situated members of the unprotected class to show discriminatory effect." Id. at 14. The plaintiffs explain that Susan Herro, a Caucasian woman, is their similarly situated comparator. Id. After describing how Herro spun out on the ice on I-94 and Highway 67 "prior to 2018," they explain that the Caucasian male deputy who responded had asked Herro if she was hurt, had asked her whether she wanted to wait in the warm squad car until the tow truck arrived, had not asked for her name or address or license or proof of identification and had not run a warrant check. Id. They explain that after reading in the newspaper about the plaintiffs' experience, Herro wrote to defendant Severson, asserting that deputies had racially profiled the plaintiffs and harassed them because they were Black; she had opined in the letter that she was treated respectfully because she was White, while the plaintiffs were not treated with respect because they were Black. Id.

The plaintiffs assert that in 2018—the year the plaintiffs encountered Michalsen—

22

the racial makeup of [Waukesha] county was 92.9% white and only 1.6% African-American. U.S. Census Bureau. See U.S. Census Bureau: *QuickFacts: Waukesha County, Wisconsin*. Washington D.C.: Jul. 1, 2018. (available at: https://www.census.gov/ quickfacts/waukeshacountywisconsin (visited April 28, 2019)).

Id. at 1 n.1. The plaintiffs emphasize that the defendants acknowledge that "discriminatory effect can be supported by statistics," but say that the defendants argue, "without explanation or citation," that the racial makeup of the county is irrelevant. Id. at 15 n.12. The plaintiffs disagree, citing Chavez, 251 F.3d at 638, and asserting, without further explanation, that the statistical evidence is relevant. Id.

The plaintiffs then detail the difference in treatment between Herro and themselves. They say that Michalsen did not treat them "as citizens in need of assistance to a disabled vehicle"—as the deputy who'd interacted with Herro had done—but had treated the plaintiffs "as if he had reasonable suspicion that they had committed a crime and subjected them to a traffic stop." Id. at 15. The plaintiffs observe that the defendants attempt to diminish these differences by arguing that the passage time between the two incidents eliminate any similarity between the situations. Id. at 16. (As a reminder, Herro's incident occurred in 2003, fifteen years prior to the incident of which the plaintiffs complain.) The plaintiffs argue that the cases cited by the defendants—Bondar v. D'Amato, Case No. 06-C-109, 2008 WL 906129 (E.D. Wis. Mar. 31, 2008); Bell v. Duperrault, 367 F.3d 703, 708 (7th Cir. 2004) and Purze v. Village of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir. 2002)—are distinguishable from the plaintiffs' case on their facts. Id.

23

Although acknowledging that "timing" can be a factor in analyzing whether "events are similarly situated," the plaintiffs argue that it is not the only factor and that the passage of a particular amount of time between two otherwise similarly situated events is not dispositive. Id. at 17 (citing Ross v. Bd. of Regents, 655 F. Supp. 2d 895 (E.D. Wis. 2009), in which the plaintiff—an academic who'd been demoted after an audit—"submitted evidence that reviews and audits dating back to 1999" showed other departments with similar audit deficiencies). The plaintiffs assert that the underlying facts of their situation and the underlying facts of Herro's are similar: like Herro, they were stranded on I-94 in Waukesha County due to a disabled vehicle, both interacted with a WCSO deputy who stopped and in both situations, the deputy departed before the tow truck arrived. Id. at 18. The plaintiffs assert that the only "substantive difference" between the two experiences is that Herro "was treated more favorably as the deputy assisted her, while the plaintiffs were treated as suspects who had broken the law." Id. (the plaintiffs maintain that the fact that Herro was stranded on the median at the end of an icy exit ramp, while they were stranded on the shoulder of the highway, is not a "material" difference). They argue that "[a]t the very least, the competing inferences to be drawn from these facts should be resolved by a jury" (citing Srail v. Village of Lisle, 588 F.3d 940, 945 (7th Cir. 2009)). Id. at 1819.

As for whether there is any evidence that Michalsen had a discriminatory purpose, the plaintiffs assert that "[t]he lack of direct evidence of racial animus is not dispositive" and the defendants' argument to that effect downplays the

24

legitimate role of circumstantial evidence in discrimination cases. Id. at 19. They emphasize that they "need not prove that the challenged action rested solely on racially discriminatory purposes, but is only required to show that it was 'a motivating factor.'" Id. (quoting Village of Arlington Heights v. Metro. Housing, 429 U.S. 252, 265 (1977)).

Responding the defendants' breakdown of Michalsen's conduct into the categories of asking for drivers' licenses, asking about the presence of guns/drugs, running a warrant check and tagging the vehicle, the plaintiffs contend that it is the totality of the circumstances that proves Michalsen's discriminatory purpose. Id. Nonetheless, the plaintiffs addressed each of these categories, as the defendants had.

The plaintiffs say that "based on his interaction with the plaintiffs and his meeting with his Captain, Michelle Larsuel, afterwards," a reasonable jury could conclude that in asking to see the plaintiffs' licenses, Michalsen "was focused on the plaintiffs on the basis of their race even though he had no reasonable individualized suspicion that they had broken any law." Id. at 20. The plaintiffs discuss their reference to Captain Larsuel:

> After meeting with Captain Larsuel, . . . Deputy Michalsen apparently recognized that he unjustifiably treated the encounter as a traffic stop, rather than a check on a disabled vehicle. When he was instructed to immediately write up a "Matter of" report, he claimed that he "advised the driver the reason I was stopping out with the vehicle was that I had notified the vehicle was pulled over close to the fog line and was not completely out of traffic." . . . This shows that Deputy Michalsen was trying, after the fact, to establish reasonable suspicion for a traffic violation to justify treating the incident with the plaintiffs as a traffic stop, rather than a disabled vehicle check. When Michalsen was deposed, however, he acknowledged—under oath—that he knew the plaintiffs were

25

completely out of traffic . . ., that the Patterson vehicle's close proximity to the fog line was not a traffic violation, . . . and that his "Matter of" statement is inaccurate, as written after the fact and is a "CYA" letter. . . .

Id. at 20-21. The plaintiffs characterize this as a "substantial issue" with Michalsen's credibility. Id. at 21.

As for Michalsen's explanation that he asked for the plaintiffs' licenses because he was trained to do so, regardless of whether the encounter involved a traffic stop or a disabled vehicle, the plaintiffs assert that this is a "problematic" explanation for two reasons. Id. They say—without further explanation, referencing only one of the defendants' proposed findings of fact—that "the facts surrounding Deputy Michalsen's claimed training are genuinely disputed." Id. They also assert that Michalsen's "self-serving claims regarding his training is [sic] contrary to the law and the department's written policies and procedures that delineate that a driver's license is requested from a driver during a traffic stop but not during a disabled vehicle check."[4] Id. The plaintiffs say that during his deposition, Michalsen couldn't explain why his training would have been different from that department policy. Id. The plaintiffs argue that

Deputy Michalsen's conduct and demeanor—in demanding the licenses and appearing angry when he was asked why . . ., his "CYA" attempt in his "Matter of" to justify his conduct by trumping up a claim of a traffic violation when there was none, and his after-the-

---

[4] See Hill v. Tangherlini, 724 F.3d 965, 967 (7th Cir. 2013) (stating that "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving" and that the Seventh Circuit has "repeatedly emphasized . . . the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.").

26

fact claim that he was trained to require drivers' licenses during a disabled vehicle check in contravention of written departmental policies—is all circumstantial evidence of his discriminatory intent. *See Hanners v Trent*, 674 F.3d 683, 694 (7th Cir. 2012) ("Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent.").

Id.

The plaintiffs contend that Michalsen asked the plaintiffs whether they had alcohol, guns or drugs "despite them not doing or saying anything that even remotely suggested that they had alcohol, guns or drugs." Id. at 22. They reject the defendants' argument that the WCSO seizes more drugs and weapons from vehicles on I-94 and I-43 than in other parts of Waukesha County, arguing that this is analogous to arguing that reasonable suspicion always exists in a high-crime neighborhood. Id.

The plaintiffs assert that Michalsen decided he'd run a warrant check "[d]espite being told that the plaintiffs were pastors and were returning from fishing at a lake," and despite acknowledging that he believed the plaintiffs were credible and truthful. Id. at 23. The plaintiffs say they genuinely dispute that the WCSO does this with every encounter, and they argue that "retaining driver's licenses and running a warrants check on an individual without their consent and without reasonable suspicion that they violated a traffic or other law is an unreasonable seizure under the Fourth Amendment." Id.

Finally, the plaintiffs assert that Michalsen put the orange disabled tag on the boat despite plaintiff Patterson asking him not to; they say that this was "not necessary, and added insult to injury." Id. at 24. In response to the

27

defendants' argument that this was standard procedure, the plaintiffs point out that the deputy who interacted with Ms. Herro did not do so (to her knowledge), and they say Michalsen didn't need to do it for the boat because the tow truck was on the way "and arrived within a half hour." Id.

c.    The Defendants' Reply

Because the plaintiffs' brief did not differentiate between their racial profiling and class-of-one claims, the defendants chose to follow suit in their reply brief. Dkt. No. 79 at n.1.

The defendants reply that "[u]nder every possible measure, Susan Herro was not similarly situated to Plaintiffs and therefore their claim fails." Id. at 2. They assert that the plaintiffs downplayed the "significant temporal difference at issue (stating Ms. Herro's vehicle became stranded 'prior to 2018') when in fact, the intervening passage of time cannot be understated: Ms. Herro's incident occurred 15 years prior to 2018." Id. (emphasis in original). The defendants say that they have explained that WCSO "obviously changed how it handles encounters with vehicles" in that fifteen-year timeframe. Id. at 2-3. They maintain that there were multiple differences between Herro's circumstances and the plaintiffs:

> [Herro] was driving a Saturn sedan in February 2003 and spun out at the end of an icy, sharp on-ramp onto I-94 where she became stranded on the median; Plaintiffs were driving a truck with a boat trailer in May 2018 when they got a flat tire and pulled of to the shoulder in a construction zone on eastbound I-94. The deputy responding to Ms. Herro did not ask various questions or tag her vehicle, but he had to leave the scene suddenly before the tow truck arrived in order to respond to a speeding vehicle.[5] Deputy Michalsen

---

[5] See Dkt. No. 70-5 at 4.

had no such interruption and was able to complete his encounter and leave before Plaintiffs' tow truck ever arrived.

Id. at 4.

The defendants maintain that the court need not reach the question of whether Michalsen had a discriminatory purpose, but they assert that the plaintiffs have failed to meet their burden on that issue. Id. They say that the plaintiffs "pay lip service to the concept of circumstantial evidence," but that their arguments depend on attacking Michalsen's credibility rather than actual evidence of discriminatory purpose. Id. They argue that "[e]valuations of witness credibility are inappropriate at the summary judgment stage," citing Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008). And they maintain that if attacks on Michalsen's credibility are all that the plaintiffs have, they are entitled to summary judgment. Id. at 4-5 (quoting Springer, 518 F.3d at 484). They argue that any disputes about Michalsen's training are immaterial "because they have no bearing on the reasonableness of Deputy Michalsen's behavior." Id. at 5. And they assert that the only "dispute" regarding Michalsen's training is the plaintiffs' "steadfast belief that WCSO deputies could not possibly be trained to ask motorists in disabled vehicles for driver's license identification, because that action is not spelled out in writing in a field training guide task sheet . . . ." Id.

The defendants take issue with the plaintiffs' assertion that Michalsen's testimony about, or interpretation of, the training sheet was "self-serving," and that it contradicted written department policy. Id. at 6. The defendants assert that "every single person who was asked about this training sheet offered the

29

same testimony and explanation." Id. They assert that the plaintiffs have not identified any law, policy, procedure or deposition testimony that contradicts Michalsen's interpretation of Task Sheet 2 or shows that Michalsen's testimony was "self-serving." Id. at 7. The defendants say that regardless of one's interpretation of Task Sheet 2, WCSO deputies are trained to ask for identification, and even if only Michalsen was trained to ask for it, there is no evidence that his asking for the plaintiffs' identification was discriminatory. Id.

The defendants characterize the plaintiffs' criticisms of inconsistencies in documents authored months apart as "hypocritical, considering the discrepancies between Dr. Williams' and Mr. Patterson's deposition testimony about relevant details of their encounter with Deputy Michalsen." Id. They assert that the plaintiffs only "speculate" about why Michalsen put some things in in his "Matter of" statement, which was written three months after the incident in question. Id.

Similarly, the defendants argue that there is no evidence to support the plaintiffs' assertion that upon seeing the plaintiffs, Michalsen became suspicious. Id. at 8. They cite Michalsen's deposition testimony, in which he averred that he did not think the plaintiffs were drug traffickers, but that he asked questions about guns and drugs to protect himself (as he said he did in any situation). Id. They rejected the applicability of the cases the plaintiffs cited. Id. at 8-9. And the defendants assert that the plaintiffs have made no arguments about how Michalsen's tagging of the boat violated the constitution, other than to argue that the deputy who interacted with Herro did not tag her

30

vehicle. Id. at 9. The defendants argue the plaintiffs ignore the fact that the deputy who interacted with Herro had to leave to pursue a speeding vehicle. Id.

### 3. *Discussion*

As the court has explained, the parties conflated the analysis for a racial profiling claim and the analysis for a class-of-one claim. Although the analyses for each of these types of claims contain some similar components, there are differences.

There are two elements to a racial profiling claim. "To prove racial profiling in violation of the Fourteenth Amendment's Equal Protection Clause, plaintiffs much show that 'the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.'" Taylor v. Schwarzhuber, 132 F.4th 480, 490 (7th Cir. 2025) (quoting Chavez, 251 F.3d at 635-36).

> To prove discriminatory purpose, plaintiffs must demonstrate that "'the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of ... its adverse effects upon an identifiable group." *Id.* at 645 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 . . . (1987)). To prove discriminatory effect, plaintiffs must show that "they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that the plaintiffs were treated differently from members of the unprotected class." *Id.* at 636. Plaintiffs can do so by identifying individuals or by presenting statistics. *See id.* Importantly, plaintiffs must show both discriminatory purpose *and* discriminatory effect.

Id. (emphasis in original).

A class-of-one claim also has two elements. To state a claim under the class-of-one equal protection theory, "'a plaintiff must allege "(1) that [they] ha[ve] been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment."'" Indiana

Land Trust #3082 v. Hammond Redevelopment Comm., 107 F.4th 693, 698 (7th Cir. 2024) (quoting 145 Fisk, LLC v. Nicklas, 986 F.3d 759, 771 (7th Cir. 2021)). "To be similarly situated the comparators must be 'identical or directly comparable in all materials respects' to the plaintiff." Navratil v. City of Racine, 101 F.4th 511, 523 (7th Cir. 2024) (quoting LaBella Winnetka, Inc. v. Village of Winnetka, 628 F.3d 937, 942 (7th Cir. 2020)). To show that there is no rational basis for the difference in treatment, a plaintiff "must 'negative any reasonably conceivable state of facts that could provide a rational basis for the difference in treatment.'" Greenwald Family Ltd. P'ship v. Mukwonago, 100 F.4th 814, 823 (7th Cir. 2024) (quoting Miller v. City of Monona, 784 F.3d 1113, 1121 (7th Cir. 2015)). "Indeed, the proffered rational basis need not be the *actual* justification; rather, 'any reasonably conceivable state of facts that could provide a rational basis will suffice.'" Id. (emphasis in original) (quoting 145 Fisk, 986 F.3d at 771)).

So to prove the first element of a racial profiling claim (the "discriminatory effect" element), a plaintiff must show that he is a member of a protected class, that he was similarly situated to members of an unprotected class and that he was treated differently from members of the unprotected class. To prove the first element of a class-of-one claim, a plaintiff must show that he was intentionally treated differently from similarly situated individuals by identifying materially identical or comparable comparator individuals. These elements are, as the parties assume, similar. The court will address the claims

32

together in analyzing the "similarly situated" element, then separately address the elements of the two claims that are different.

a.    "Similarly situated" element for both claims

To prove the "discriminatory effect" element of a racial profiling claim, a plaintiff can prove that he was similarly situated to members of an unprotected class and was treated differently by "identifying individuals or by presenting statistics." Taylor, 132 F.4th at 490. See also, Chavez, 251 F.3d at 636. When a plaintiff elects to identify similarly situated individuals (comparators), the court must determine whether that individual is similarly situated to the plaintiff by looking at "all relevant factors, the number of which depends on the context of the case." Chavez, 251 F.3d at 636 (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000)). The Seventh Circuit has emphasized that there is no "magic formula for determining whether someone is similarly situated;" it is a fact-based inquiry. Id. But the plaintiff and the comparator must be "similarly situated in all pertinent respects." Id. at 637.

Nor is there any "precise formula to determine whether an individual is similarly situated to comparators" in a class-of-one context. McDonald v. Village of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004). But "a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." Id. And in the class-of-one context, the Seventh Circuit has emphasized that "similarly situated individuals must be very similar indeed." Id. (citing Purze, 286 F.3d at 455). The appellate court has "imposed on plaintiffs [a] . . . high burden with

33

regard to establishing someone who is similarly situated in the context of 'class of one' equal protection claims." Id. at 1003 (citations omitted).

The plaintiffs assert that they are members of a protected class, dkt. no. 43 at ¶43, and the defendants concede that "[t]here is no dispute that Plaintiffs are members of a protected class," dkt. no. 68 at 6. The question regarding the discriminatory effect element of the plaintiffs' racial profiling claim and the similarly situated element of their class-of-one claim is whether the plaintiffs have demonstrated that they were "similarly situated" to members of an unprotected class. It appears that the plaintiffs have elected to make their similarly-situated showing by identifying a comparator—Susan Herro. The court says it "appears" that the plaintiffs have made that choice because they also have provided statistics. In  paragraph 32 of the amended complaint (filed in June 2020), the plaintiffs alleged that "Waukesha is the third-most populous county in Wisconsin, and the racial makeup of the county is 92.9% white and only 1.6% African American." Dkt. No. 43 at ¶32 (citing the U.S. Census Bureau, https://www.census.gov/quickfacts/waukeshacountywisconsin as of April 28, 2019). On the first page of their opposition brief, the plaintiffs inserted a footnote claiming that in 2018—the year the plaintiffs encountered Michalsen—"the racial makeup of [Waukesha] county was 92.9% white and only 1.6% African-American." Dkt. No. 76 at 1 n.1. They cited this statistic again in a footnote on page 12 of their brief, along with their entire argument relating to that statistic: that it is "relevant evidence in this case." Id. at 15 n.12.

34

To the extent that the plaintiffs intended to use statistics to prove that they are similarly situated to members of an unprotected class, this single statistic about the 2018 racial demographics of the county in which they encountered Michalsen is woefully insufficient. "[P]arties may not prove discrimination merely by providing the court with statistical analyses. The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." Chavez, 251 F.3d at 638 (citing Schweiker v. Wilson, 450 U.S. 221, 223 (1981)). The "particular statistics presented to the Court" must "address the relevant issue." Id. at 639. The fact that in 2018, Waukesha County's population was 92.9% White and 1.6% Black provides *no* information about the percentage of White and Black individuals who encountered members of the WCSO that year, under what circumstances they encountered deputies, how many were asked for their identification or were subject to warrant checks. The plaintiffs' bare recitation of this statistic implies that the fact that Waukesha County had a majority White population at the time of their encounter with Michalsen is evidence that Michalsen discriminated against them because they were Black. It is not.

That leaves the other option the plaintiffs have for showing that they were "similarly situated" to members of an unprotected class: comparators. The plaintiffs have identified a single comparator, Herro (who is White and thus not a member of the protected class). Dkt. No. 76 at 14. Like the plaintiffs, Herro encountered a WCSO deputy on I-94 in Waukesha County. As was Michalsen,

35

the deputy whom Herro encountered was White. As happened with the plaintiffs, a deputy interacted with Herro because her vehicle was disabled. As happened with the plaintiffs, the deputy who interacted with Herro left before her tow truck arrived. But that is where the similarities end.

Herro encountered the WCSO deputy in February, after her car had spun out on ice and ended up stranded on a median. Unlike the plaintiffs' vehicle, Herro's vehicle was in the middle of the highway (rather than off to the side) in icy conditions, presenting a risk to her and to surrounding drivers. Unlike the plaintiffs, Herro had not been able to get her vehicle or herself to a relatively safe location. In contrast, the plaintiffs suffered their flat in May, in daylight (the record does not reflect any inclement weather), and were able to get their vehicle off the highway before stopping. Herro encountered the WCSO deputy (who, the parties agree, could not have been Michalsen) in 2003, fifteen years before the plaintiffs encountered Michalsen. There is no evidence in the record regarding how the deputy who encountered Herro was trained, or what the WCSO's policies were in 2003 regarding obtaining identification or asking about contraband or running a warrant check. Nor is there evidence before the court about the WCSO's 2003 policy regarding putting stickers on disabled vehicles.[6] And although the deputies in both cases departed before the tow truck arrived, the deputy interacting with Herro appears to have departed

_____

[6] The policies that the parties have provided the court were drafted in 2014 and implemented in 2014 and 2015. See, e.g., Dkt. Nos. 70-12, 70-18.

abruptly to respond to a speeding vehicle. Michalsen appears to have left the plaintiffs because he concluded that there was no need for him to stay.

These distinctions demonstrate that Herro was not similarly situated to the plaintiffs in all pertinent aspects. The placement of her vehicle put her and other drivers at risk; the placement of the plaintiffs' vehicle did not. The circumstances that forced Herro to stop gave rise to a reasonable inference that she could be injured or uncomfortably cold; the circumstances that forced the plaintiffs to stop did not. As for the passage of time between the two incidents, the Seventh Circuit has found that plaintiffs and comparators are not similarly situated when the plaintiffs cannot show that there are, at least, identical or directly comparable time periods and decisionmakers. See Purze, 286 F.3d at 455 (the plaintiff submitted his plat during different time periods and had his plat request denied by a different board than the comparators); Maulding Dev., LLC v. City of Springfield, Ill., 453 F.3d 967, 970 (7th Cir. 2006) (the plaintiff offered no evidence regarding the timing of alleged other plans and whether they were submitted to the different city council members); McDonald, 371 F.3d at 1003 (the plaintiff offered as evidence cause and origin reports prepared by a municipal fire department, some dating back twenty years).

Given the differences in circumstances, no reasonable jury could conclude that Herro was similarly situated to the plaintiffs in all pertinent respects. Because the plaintiffs have not provided statistical data showing similarly situated individuals who were treated differently than they were, and because they have not identified a similarly situated comparator, they have not

37

proven the "discriminatory effect" element of a racial profiling equal protection claim.

> b.      Additional element of a racial profiling claim

Even had the plaintiffs proven that Michalsen's conduct had a discriminatory effect, they have presented no evidence of a discriminatory purpose, which is required to prove the racial profiling claim. "To prove discriminatory purpose, plaintiffs must demonstrate that the decisionmaker selected or reaffirmed a particular course of action at least in part because of its adverse effects upon an identifiable group." Taylor, 132 F.4th at 490 (quoting Chavez, 251 F.3d at 645) (internal quotation marks omitted)).

Although apparently conceding that there is no "direct evidence of a racial animus" in Michalsen's interaction with them, the plaintiffs urge the court to consider what they have described as circumstantial evidence. Generally, the plaintiffs have described Michalsen as being abrupt, commanding, brusque and insulting; they contrast this with Herro's description of the deputy who interacted with her as being empathic, solicitous and concerned. Accepting as true for the purposes of summary judgment the plaintiffs' characterization of Michalsen's demeanor, allegations of rude or insulting behavior are not sufficient to prove discriminatory purpose. As the First Circuit Court of Appeals has said,

> rude and unprofessional conduct are, unfortunately, all to prevalent in the world. Persons from any racial background may sometimes encounter it. That behavior without more—reprehensible as it is— falls short of creating a reasonable inference that [the plaintiff's] race—as opposed to other factors—was a motivating factor in defendants' alleged responses . . . . Were we to hold otherwise, any

38

unsatisfactory dealings between a public official and a minority, female or other citizen falling into a protected category would give rise, prima facie, to a potential equal protection claim.

Judge v. City of Lowell, 160 F.3d 67, 77 (1st Cir. 1998).

Specifically, the plaintiffs maintain that in demanding their licenses, asking about the presence of contraband, running a warrant check and putting a tag on the boat, Michalsen treated them as if they'd been stopped for a traffic or criminal violation, rather than treating them as individuals whose vehicle was disabled and who might need help. They argue that this treatment—treating them as if they were wrongdoers rather than people in need of assistance—is circumstantial evidence of discriminatory purpose.

In part, the plaintiffs' argument is based on two WCSO policies. Policy 6.07 of the Waukesha County Sheriff's Department (issued November 8, 2014 and effective December 8, 2014) lays out the guidelines for WCSO members who stop and approach "traffic law violators."[7] Dkt. No. 70-18. These guidelines state that "[w]anted and driver status checks" on the car's operator and passengers "should be made," dkt. no. 70-18 at 5, and that the deputy should "[a]sk for the violator's driver's license and proof of vehicle insurance," dkt. no. 70-18 at 5. The plaintiffs contrast this policy with WCSO policy 6.10 (issued November 29, 2014 and effective December 29, 2014), which governs—among other things—disabled vehicles. Dkt. No. 70-12. This policy requires deputies to stop for disabled vehicles "unless a courtesy tag has been affixed to the

---

[7] Policy 6.06 also appears to apply to interactions with traffic violators and contains similar instructions. Dkt. No. 70-11.

vehicle or exigent circumstances dictate otherwise." Dkt. No. 70-12 at 7. It prohibits deputies from leaving a disabled vehicle on a highway unless the deputy has, among other things, completed and attached an emergency tag. Id. at 8. The plaintiffs emphasize that unlike the "traffic law violators" policy, the disabled vehicle policy says nothing about a deputy asking for a driver's license or other information. Dkt. No. 76 at 6.

The plaintiffs assume that because the disabled vehicle policy does not mention performing warrant checks or asking for drivers' licenses or other identification, a deputy who does so in a disabled vehicle scenario must have a nefarious motive. The plaintiffs read the disabled vehicle policy too broadly. The general purpose of Policy 6.10 is to "ensure the safe and efficient movement of *motor vehicles and pedestrians* . . . ." Dkt. No. 70-12 at 1 (emphasis added). Its focus is on ensuring that parked, stranded or disabled vehicles do not pose risks to other drivers. The policy acknowledges that often there may not be a driver present with a disabled, parked or stranded vehicle; it advises deputies to tell "callers" that if the vehicle is illegally parked or is a hazard, the vehicle may be towed. Id. at 8. The plaintiffs also assume that the fact that the "traffic law violators" policy requires license and warrant checks means that deputies may perform license and warrant checks *only* in "traffic law violator" situations—a restriction the policy does not contain.

At Michalsen's July 8, 2021 deposition, the plaintiffs' counsel asked, "on a disabled vehicle, that authority to get the driver's license and run it through the system is not allowed, correct?" Dkt. No. 7-1 at 13, Tr. p. 46, lines 17-20.

40

Michalsen responded that in his training, he was "expected to identify everybody that [he was] in contact with." Id. at lines 21-24. He conceded that if there was no traffic violation, he could not insist on getting a driver's license and running a warrant check. Id., Tr. p. 49, lines 2-6. Later in the deposition, the plaintiffs' counsel asked Michalsen why he'd have been trained to obtain identification from everyone, when the disabled vehicle policy did not require it. Id. at 20, Tr. p. 74, lines 13-18. Michalsen responded that he could not "speak to why certain field training officers train getting driver's license compared to not getting driver's license." Id., Tr. p 75, lines 7-9. The plaintiffs are skeptical of Michalsen's assertion that he was trained to get driver's licenses from everyone and argue that his insistence that he was so trained is circumstantial evidence of discriminatory purpose. But the plaintiffs have identified no evidence that Michalsen did not receive the training he testified that he received. A plaintiff cannot "create a triable issue of fact simply by challenging [the defendant's] credibility" on his discriminatory motive. Ford v. Sessoms, 727 F. App'x 875, 877 (7th Cir. 2018).

The plaintiffs also assert that Michalsen's interaction with his captain a few months after the incident with the plaintiffs constitutes circumstantial evidence of discriminatory purpose. Michalsen testified that he met with his captain, Michelle Larsuel, the same day he completed a "Matter Of" memo. Dkt. No. 70-1 at 21, Tr. p. 79, lines 1-7; 23, Tr. p. 82, lines 21-25 through Tr. p. 83, lines 1-10. (The "Matter Of" memo is dated August 6, 2018—three months after the plaintiffs' encounter with Michalsen. Dkt. No. 75-7.) Michalsen testified

41

that Larsuel asked him whether the incident with the plaintiffs involved a traffic stop or a disabled vehicle. Dkt. No. 70-1 at 21, Tr. p. 79, lines 10-12. He also testified that he knew at the time of the incident that "[the plaintiffs] were completely out of traffic." Id. at 31, Tr. p. 120, lines 3-5.

The "Matter Of" memo that Michalsen wrote immediately following his August 2021 interaction with Captain Larsual stated that the plaintiffs' "vehicle was pulled over close to the fog line and was not completely out of traffic." Dkt. No. 75-7 at 1. He also wrote that "the area was being prepared to have construction done and had orange barrels placed along the side of the road." Id. He reported that he'd asked the plaintiffs for their licenses, and asked them about weapons or drugs, as he did with "every vehicle [he came] in contact with." Id. And he wrote that he put the plaintiffs' information "into supplemental information, as I do on every vehicle I come into contact with." Id. at 2.

The plaintiffs argue that "[a]fter meeting with Captain Larsuel, . . . Deputy Michalsen apparently recognized that he unjustifiably treated the encounter as a traffic stop, rather than a check on a disabled vehicle." Dkt. No. 76 at 20. They assert that although Michalsen had testified at his deposition that the plaintiffs were completely out of traffic, once Larsuel asked Michalsen to write up what had happened, Michalsen tried, "after the fact, to establish reasonable suspicion for a traffic stop to justify treating the incident with the plaintiffs as a traffic stop, rather than a disabled vehicle check." Id. They make

42

this assertion based on Michalsen's statement in the "Matter Of" memo that the vehicle was close to the fog line and not out of traffic.

But Michalsen has not asserted that the plaintiffs were traffic violators, or that he asked for their licenses or ran a warrant check because they were traffic violators. It is not clear why he would try to "fake" reasonable suspicion that the plaintiffs were traffic violators, yet argue—as he consistently has in this case—that the incident involved a disabled vehicle.

The plaintiffs are skeptical about Michalsen's testimony that asking about contraband was routine; again they argue that this question is circumstantial evidence that Michalsen converted a disabled vehicle incident into a "*Terry* stop," dkt. no. 76 at 23, which in turn is circumstantial evidence of discriminatory purpose. But again, the plaintiffs cannot "create a triable issue of fact simply by challenging [the defendant's] credibility" on his discriminatory motive. Ford, 727 F. App'x at 877. Similarly, the plaintiffs are skeptical of the defendants' arguments that they run warrant checks in all types of encounters, and similarly, that skepticism is not sufficient to create a genuine issue of material fact regarding discriminatory purpose.

Finally, the plaintiffs argue that Michalsen tagged the boat even though plaintiff Patterson asked him not to, which "was not necessary, and added insult to injury." Dkt. No. 76 at 24. But the record evidence—Policy 6.10— demonstrates that tagging the vehicle *was* required by WCSO policy, dkt. no. 70-12 at 8, and alleging "adding insult to injury" does not suffice to prove discriminatory purpose.

43

Because the plaintiffs have not demonstrated that they were similarly situated to members of an unprotected class in all pertinent ways, and because even if they had, they have not presented evidence of discriminatory purpose, the court will grant summary judgment in favor of the defendants on Count One—the plaintiffs' racial profiling claim.

c.    Additional elements of a class-of-one claim

As with the racial profiling claim, the plaintiffs have failed to satisfy the first element of a class-of-one claim; they have not shown that they were similarly situated to the one comparator they identified, Susan Herro. But the Seventh Circuit has held that "it is not always necessary to find a similarly situated person" to bring a class-of-one claim. Frederickson, 943 F.3d at 1062. "If animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual." Swanson v. City of Chetek, 719 F.3d 780, 784 (7th Cir. 2013). To prove such animus, "[t]he plaintiff must plead and prove *both* the absence of a rational basis for the defendant's action *and* some improper personal motive (which need not be hostility, but could be, for example, corruption) for the differential treatment." Del Marcelle v. Brown C'nty Corp., 680 F.3d 887, 899 (7th Cir. 2012) (emphasis in original). The plaintiff must prove "*intentional discriminatory treatment* that *lacks any justification based on public duties* and that there be some *improper personal motive* for the discriminatory treatment." Id. (emphasis in original). So even though the court has concluded that Herro is not similarly situated to the plaintiffs in all pertinent respects, the plaintiffs

44

can prove a class-of-one claim if they can show a "readily obvious" animus for disparate treatment, Swanson, 719 F.3d at 784, and that there was no "rational basis for the difference in treatment," Engquist v. Oregon Dep't of Agr., 553 U.S. 591, 602 (2008); see Fares Pawn, LLC v. Ind. Dept. of Fin. Inst., 755 F.3d 839, 845 (7th Cir. 2014).

In Swanson, the plaintiff "identified his specific harasser, provided a plausible motive and detailed a series of alleged actions by [the defendant] that appear illegitimate on their face." Swanson, 719 F.3d at 785 (finding that all the plaintiff needs to show is "that harassment, yelling, arbitrary denials and frivolous litigation do not normally follow requests for fence permits"). The Swanson court compared those facts to the facts in Geinosky, 675 F.3d at 745, in which the plaintiff "received twenty-four bogus parking tickets within a year, all written by officers of Unit 253 of the Chicago Police Department." Swanson, 719 F.3d at 785. The Swanson court opined that "animus could be inferred from the sheer absurdity of the number of illegitimate tickets." Id.

The plaintiffs have not presented any evidence of readily obvious animus. There is no evidence that Michalsen (who only recently had joined the WCSO) knew the plaintiffs or had past experience with them. They have presented no evidence of any motive Michalsen might have had for singling them out. They have presented no evidence that Michalsen harassed them, yelled at them, called them names or was trying to retaliate against them for anything. Even accepting the plaintiffs' characterization of Michalsen's conduct as true, a single instance of a law enforcement officer asking the drivers of a disabled

45

vehicle for their IDs, running a warrant check, asking about the presence of contraband and tagging the disabled vehicle is neither "bogus" nor a "sheer absurdity" amounting to a readily obvious discriminatory animus sufficient to do away with the similarly situated comparator requirement.

Nor have the plaintiffs presented evidence that Michalsen had no rational basis for asking for their licenses, running the warrant check, asking about contraband or tagging the boat. A plaintiff must not only show that he was treated differently from an otherwise similarly situated individual, but that there was no "rational basis for the difference in treatment." Engquist, 553 U.S. at 602; Olech, 528 U.S. at 564; Fares Pawn, 755 F.3d at 845 (a plaintiff must show "an absence of rational basis by identifying some comparator"). The court already has recounted that Michalsen explained his reasons for each of the actions he took. The plaintiffs are skeptical of his explanations for asking for their licenses, running the warrant check and asking about contraband, but that skepticism does not amount to evidence that the explanations were false. And Michalsen was complying with policy when he tagged the boat.

Because the plaintiffs have not identified a similarly situated comparator, have not presented evidence of a readily obvious discriminatory animus and have not presented evidence that Michalsen had no rational basis for his actions, the court will grant summary judgment on Count Two—the plaintiffs' class-of-one claim.

B.    <u>Fourth Amendment Claims</u>

    1.    *Unreasonable Seizures: Count Three*

The plaintiffs re-allege that Michalsen "unlawfully transformed a disabled vehicle encounter into an unlawful stop by asking [them] about guns and drugs, compelling production of [their] driver's licenses and running warrants checks, all absent any reasonable suspicion of a crime." Dkt. No. 43 at ¶66. They also allege that in performing these actions, Michalsen "extended the stop," <u>id.</u> at ¶67, that the plaintiffs "understood" that they were not free to refuse to produce their licenses or to leave and that despite having no reasonable suspicion of a crime, Michalsen "unlawfully restrained the plaintiffs' movement to perform warrant checks," <u>id.</u> at ¶70.

To prove an unreasonable seizure in violation of the Fourth Amendment, the plaintiffs must prove that the defendants' conduct constituted a seizure and that the seizure was unreasonable. <u>Hess v. Garcia</u>, 72 F.4th 753, 761 (7th Cir. 2023) (citation omitted). A "seizure" can occur when "the suspect's freedom of movement is restrained either by physical force or by submitting to the assertion of police authority." <u>United States v. Wilson</u>, 963 F.3d 701, 703 (7th Cir. 2020). The second type of seizure—submitting to the assertion of police authority—requires not only a show of authority, but a showing that "the person at whom [the show of authority] is directed actually submits to that authority." <u>United States v. Griffin</u>, 652 F.3d 793, 798 (7th Cir. 2011) (citing <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991)).

In a court's analysis of whether there has been a seizure, "the traditional approach is whether the person believed he was 'free to leave.'" Carlson v. Bukovic, 621 F.3d 610, 618 (7th Cir. 2010). "This standard is an objective one and 'is made on the basis of the "totality of the circumstances" surrounding the encounter.'" Id. (quoting United States v. Jerez, 108 F.3d 684, 690 (7th Cir. 1990)). "[A]n important caveat to the free to leave standard . . . is that 'when a person "has no desire to leave" for reasons unrelated to the police presence, the "coercive effect of the encounter" can be measured better by asking whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."'" Id. (quoting Brendlin v. California, 551 U.S. 249, 255 (2007)); see Hall v. City of Chicago, 953 F.3d 945, 951 (7th Cir. 2020) (holding that the test for seizure is objective, "whether 'a reasonable person would feel free to terminate the encounter.'"). The same analysis applies if leaving is impractical—courts ask whether a reasonable person would feel free to decline the officers' requests or end the encounter. United States v. Davis, 50 F. App'x 313, 316 (7th Cir. 2002).

> Circumstances that suggest a seizure include "the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place." *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 . . . (1980)). Courts also consider whether police made statements to the citizen intimating that he or she was a suspect of a crime, *United States v. Borys*, 766 F.2d 304, 311 (7th Cir. 1985), whether the citizen's freedom of movement was intruded upon in some way, [*Michigan v.*] *Chesternut*, 486 U.S. [567,] at 575 [(1988)] . . ., whether the encounter occurred in a public or private place, *United States v.*

48

*Adebayo*, 985 F.2d 1333, 1338 (7th Cir. 1993), and whether the officers informed the suspect that he or she was free to leave. *Id.* These factors, however, are neither exhaustive nor exclusive. *See Mendenhall*, 446 U.S. at 554 . . . (indicating that such factors are merely "[e]xamples").

United States v. Smith, 794 F.3d 681, 684 (7th Cir. 2015). Other factors that may be relevant are "whether the person was deprived of identification or other vital documents without which he could not leave . . . [and] whether the officers' tone of voice was such that their requests would likely be obeyed." United States v. Ahmad, 21 F.4th 475, 479 (7th Cir. 2021) (internal citations and quotation marks omitted).

### a. Parties' Arguments

The defendants argue that there was no seizure under the Fourth Amendment because Michalsen did not stop the plaintiffs, pull them over, detain them or inhibit, impede or delay their freedom of movement. Dkt. No. 68 at 16. They maintain that "the reasonable person standard does not depend on subjective perceptions of the involved citizen or his personal characteristics such as race." Id. at 17. The defendants argue that Michalsen's conduct did not include factors courts have enumerated that could suggest that a seizure has occurred: "the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice indicating that compliance with the officers' request might be compelled and the location in which the encounter takes place." Id. at 19. And they maintain that, even if a seizure occurred, it was reasonable based on recognized community caretaker functions. Id. at 22.

49

The plaintiffs respond that although police officers may have law enforcement concerns while performing community caretaker functions, such concerns do not allow them to turn a disabled vehicle check into an investigatory stop unless there is reasonable suspicion that an individual has committed or is about to commit a crime. Dkt. No. 76 at 4, 6. The plaintiffs argue that the circumstance in which they provided their driver's licenses—Michalsen allegedly turning a disabled vehicle check into a traffic stop; not identifying himself; not asking if they needed help; requesting identifications; asking if they had any guns, drugs or alcohol in the car and looking angry—raise a genuine dispute of material fact as to whether the encounter was consensual or compelled. Id. at 6-7. The plaintiffs argue that they were not free to drive away during the time that Michalsen had their driver's licenses. Id. at 10-11. They also contend that Michalsen's conduct and demeanor—demanding licenses, allegedly looking angry and activating the squad car lights—subjected the plaintiffs to a seizure. Id. at 11-12.

The defendants reply by reiterating that there was no seizure under the Fourth Amendment because Michalsen neither stopped the plaintiffs nor prolonged the time they were stopped on the side of the highway. Dkt. No. 79 at 10. They maintain that Michalsen's inquiries were constitutionally permissible, justified by officer safety concerns and community caretaker functions. Id.

50

b.    Analysis

As discussed above, even if police officers do not stop an individual, have physical contact with him or otherwise inhibit his freedom of movement, a seizure still can occur if a reasonable person would not feel free to decline the officers' requests or otherwise terminate the encounter. Bostick, 501 U.S. at 429–30; see Hall, 953 F.3d at 951. The "free to leave" analysis does not fit the circumstances of the plaintiffs' encounter with Michalsen; they had a flat tire and couldn't go anywhere until the tow truck came. So the question of whether there was a seizure depends on whether there was a show of authority, whether the plaintiffs submitted to it and whether a reasonable person would have felt free to decline Michalsen's requests or terminate the encounter.

The encounter began while the plaintiffs were on the side of the road, in their vehicle, having called their insurance company. Powell noticed that there was a vehicle behind them with its emergency lights on. Dkt. No. 70-3 at 10, Tr. p. 37, lines 19-21. The lights stayed on during the entire encounter. Id., Tr. p. 38, lines 5-7. The Seventh Circuit has held that in the context of officers following a vehicle and deciding to initiate a stop, their activation of their squad's emergency lights "unquestionably qualifie[s] as a show of authority . . . " Griffin, 652 F.3d at 798. But that was not the context in this case— Michalsen was not following the plaintiffs or deciding to initiate a stop. He activated the lights while the squad was at the side of the road, just behind the plaintiffs' stranded vehicle. Whether the activation of emergency lights in that circumstance constituted a seizure depends on whether, "in view of all of the

51

circumstances surrounding the incident," "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Brendlin, 551 U.S. at 255 (quoting Mendenhall, 445 U.S. at 554, and Bostick, 501 U.S. at 435-36). Under this test, Michalsen's activation of his lights was not a seizure; a reasonable person sitting in a stranded vehicle in broad daylight and seeing an officer behind him with lights activated could not conclude that he was being subjected to law enforcement authority to which he must submit.[8]

Michalsen next approached the driver's side of the vehicle, occupied by Patterson. The parties do not dispute that Michalsen was wearing a standard law enforcement uniform, did not display a weapon, did not make physical contact with either plaintiff and did not knock on the vehicle's windows. Dkt. No. 78 at ¶¶55-58. What Michalsen *did* do was ask for Patterson's license. Arguably, a uniformed officer asking a citizen for his license could constitute a show of authority, and a citizen's compliance with that request could constitute submission to that authority. But "[i]t is well established that a seizure does not occur merely because a police officer approaches an individual and asks him or her questions." Smith, 794 F.3d at 684 (citations omitted). And "[m]erely asking for identification does not amount to a seizure under the Fourth Amendment." Hall, 953 F.3d at 951. "'[I]nterrogation relating to one's identity

---

[8] Although the test is not subjective, plaintiff Patterson testified at his deposition that when he saw the lights in his rearview mirror, he told Williams that there was someone behind them and that he was "guessing they coming to help and find out what's going on with us." Dkt. No. 70-3 at 11, Tr. p. 38, lines 10-14.

or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.'" Id. (quoting Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty., 542 U.S. 177, 185-186 (2004)). "'[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification . . . as long as the police do not convey a message that compliance with the requests is required.'" Id. (quoting Bostick, 501 U.S. at 434-35).

Patterson testified at his deposition that Michalsen said, without any greeting or preamble, "Let me see your license . . . your driver's license" or "I need to see your driver's license." Dkt. No. 70-3 at 11, Tr. p. 38, lines 19-24; 12, Tr. p. 41, line 2. Patterson testified that he felt "compelled" to show Michalsen his license; he testified that although he was cautious about what he said because he did not want to escalate the situation, he wondered why Michalsen asked for his license. Id., Tr. p. 41, lines 4-21. He testified that when Michalsen then asked Williams for his license, Patterson wondered why. Id. at 12, Tr. p. 42, lines 20-24. He testified that Williams asked Michalsen why Michalsen needed to see Williams's license, which appeared to make Michalsen "perturbed" and caused him to say, "I have to do this because my supervisor is in the vehicle watching me." Id., Tr. p. 45, lines 1-18. Patterson testified that he was shaken and afraid that things might escalate. Id. at lines 19-25; 13, Tr. p. 46, lines 1-11.

Williams testified at his deposition that Michalsen first asked whether the men had any guns, drugs or alcohol in the car. Dkt. No. 70-4 at 6, Tr. p.

19, lines 2-9. He said that he responded by advising Michalsen that he—Williams—was a university professor and that the two had nothing like that in the car. Id. Williams testified that Michalsen's next words were, "We need your license." Id. at lines 10-11. Williams testified that Patterson said, "Okay. Well, here you go." Id. at lines 11-12. He testified that Michalsen then said to Williams, "I need yours, too." Id. at lines 12-13. Williams said, "Why do you need mine? We are stopped. We are waiting for roadside assistance." Id. at 14-15. Williams said that upon hearing that, Michalsen "immediately" walked from the driver's side of the car to the passenger's side and said, "I will need your license, too." Id. at lines 15-20. Williams explained that he then said, "Sir, as I told you, I said I'm a pastor and professor, why do you need my license? We haven't done anything." Id. at lines 20-22. According to Williams, Michalsen responded, "It's our policy." Id. at lines 22-24. Williams responded, "What policy is that that—I mean, that you would need my license?" Id., lines 24-25; Tr. p. 20, line 1. Williams testified that he wanted to protest further, but that he "saw the way Pastor Patterson was shaking." Id. at Tr. p. 20, lines 1-3. At that point, Williams said, "I don't agree with this, this is wrong, so I give you this in protest." Id. at lines 4-5.

At Williams's deposition, when counsel asked Williams when he got his wallet in his hand to take out his license, Williams testified:

> I didn't do it immediately. When [Michalsen] came around to the car, I said, "Why do you need my license? I told you we are pastors." And I said, "I'm a university professor. We don't have guns or drugs. Why do you need our license?" And he said, "It's our policy." I said, "What kind of policy is that that you just discriminately request someone's license?"

54

And that's when he said, "My supervisor is in the car, and so I have to get your license." And so moments turned into an eternity where I had to determine within myself where this goes depends on me, because I will get a sense of where it might go with him. So I said, "I give this in protest, but this is not" — "this is discriminatory. This is not right because we had not done anything."

I know if you are pulled over, it's one incident, but if you are waiting for roadside assistance, you should not be treated or assumed you are guilty of something. That's the way I perceived an action from the guns, drugs, alcohol, not may I help you. It just took on a character assumption of some kind of guilt.

Q.: But you acknowledge that you could have said, "No, I'm not giving you the driver's license"?

A.: Does society give—from my perspective—I'm letting you know from my perspective, I've had interactions with the police that would seem—"Is your driver's license—"are they legitimate?" Would you ask a middle-aged white man with his shirt on if his was legitimate, or would you just take it and go?

So from my experience, I knew, and so history bares, if you push a situation that can be a minor interaction with law enforcement, it can cost you your life. So I made a life and death decision, from my perspective. If I don't, where would this go?

So yeah, I'm feeling a little shaky now just thinking about it, because I don't know why two middle-aged black men sitting in a boat with fish would even be approached in that manner. To me, it was racist, because I can't imagine two middle-aged white men in a boat having gone fishing with fish in the boat, "Give me your license, we are going to run a warrant check."

Id. at 6, Tr. p. 21, line 8 through 7, Tr. p. 23, line 6.

Williams testified that Michalsen "made . . . clear" that Michalsen was not leaving without the licenses, by saying, "I have to get them because my supervisor is in my car," and by "his bodily demeanor leaning into [Williams]," which gave Williams the impression "that [Michalsen] would not back down no matter how I play it with him." Id. at 7, Tr. p. 24, lines 10-16.

Given all these facts, the plaintiffs assert that the circumstances under which Michalsen took their licenses were coercive—that Michalsen gave the impression that compliance was required. The court cannot dispute plaintiff Patterson's lived experience or the plaintiffs' perceptions. But as the court has explained, the test is an objective, reasonable person test—an "everyman" test; it is not based on any particular plaintiff's experiences. And the test requires the court to look at all the circumstances surrounding the encounter. Here, the officers stopped because there was a vehicle parked at the side of the road. Michalsen did not ask either plaintiff to get out of the vehicle. His uniform identified him as a police officer. When asked why he wanted the plaintiffs' identification, he explained (mostly saying that he needed to ask for the licenses because his supervisor was in the squad car). He did not tell the plaintiffs that they were required to answer his questions. He did not threaten them with arrest. And as the Seventh Circuit has held, though Michalsen is White and the plaintiffs are Black, "there can't be a rule that a police officer is forbidden to speak to a person of another race." United States v. Radford, 856 F.3d 1147, 1149 (7th Cir. 2017).

Radford involved a defendant on an Amtrak train. While the train was stopped, a police officer knocked on the door of her tiny roomette; the defendant opened the door and, while standing outside, the officer identified himself as law enforcement, told the defendant he was conducting security checks to "check for people transporting illegal narcotics on trains" and asked for the defendant's ID and train ticket. Radford, 856 F.3d at 1148. The

56

defendant produced the ID, after which the officer asked her a series of questions about who had packed her bags and what she was transporting. Id. The officer then asked to search the defendant's luggage, and she agreed. He asked her to step outside the roomette while he searched, and she agreed. Id. The defendant argued that the incident constituted a seizure because she did not feel free to decline the officer's request or terminate the encounter; she asserted that she was intimidated by the officer

> primarily because the roomette was small, [the officer[ weighed 170 pounds and was fully uniformed and equipped (he was wearing a holster with a gun in it), he was white and she was black, he was standing and she was sitting, he said he was investigating drug trafficking but didn't tell her she had a right to refuse to answer his questions or consent to a search of her handbags.

Id. at 1149. The Seventh Circuit disagreed, explaining that

> [the police officer] didn't enter the roomette before [Radford] consented to the search, his uniform with all its accouterments established his identity as a police officer, he told her why he wanted to search her, there can't be a rule that a police officer is forbidden to speak to a person of another race, and since he didn't tell her that she had to answer his questions and didn't threaten her with arrest there was no need to tell her that she didn't have to answer his questions or consent to a search—that was implicit in his asking her questions without telling her that she was required to answer them.

Id.

The incident here is similar to the incident in Radford, and like the Radford court, this court cannot conclude from the totality of the circumstances that a reasonable person would not have felt free to decline Michalsen's requests or end the encounter. Accepting the plaintiffs' description of Michalsen's demeanor as brusque, even rude, Williams's own testimony reveals that he was not so coerced or intimidated that he was dissuaded from

57

asking Michalsen questions about why Michalsen was asking for the licenses. His own testimony demonstrates that he expressed disagreement with being asked for his license, and that he turned the license over because of his concern for Patterson. The fact that Williams's lived experiences caused him to feel pressured does not equate to a determination that a generic reasonable person would have felt pressured under the totality of the circumstances. Based on the facts in the record, a reasonable jury could not conclude that a seizure occurred.

Nor did Michalsen's actions in taking the licenses and running a warrants check transform the encounter into a seizure. "[A]n officer's retention of a suspect's identification does not *necessarily* transform an otherwise consensual encounter into a seizure." <u>Ahmad</u>, 21 F.4th at 481 (citing <u>United States v. Soto-Lopez</u>, 995 F.2d 694 (7th Cir. 1993) (emphasis in the original)). "What's important is *how long* and *under what circumstances* the . . . identification documents were retained." <u>Id.</u> (emphasis in original).

As for how long Michalsen had the plaintiffs' licenses, it appears that Michalsen's encounter with the plaintiffs took about sixteen minutes. Dkt. No. 70-1 at 33, Tr. p. 128, lines 7-9. Patterson estimated that Michalsen had the men's licenses for perhaps fifteen minutes. Dkt. No. 70-3 at 14, Tr. p. 52, lines 7-25. Williams estimated it was eight to ten minutes. Dkt. No. 70-4 at 12, Tr. p 26, lines 5-9. Either way, Michalsen had the licenses for a matter of minutes at a time when the plaintiffs could not do anything but sit and wait, given the flat

58

tire. His taking the licenses for that short period did not transform the encounter into a seizure.

Finally, even if seizure had occurred, the plaintiffs must show that it was unreasonable. Washington v. City of Chicago, 98 F.4th 860, 868 (7th Cir. 2024) (citing Carlson, 621 F.3d at 618). The defendants argue that any seizure that occurred was reasonable based on recognized community caretaker functions. Dkt. No. 68 at 22. "The community caretaking doctrine recognizes that police sometimes take actions not for any criminal law enforcement purpose but rather to protect members of the public." Sutterfield v. City of Milwaukee, 751 F.3d 542, 553 (7th Cir. 2014). "[T]he 'frequency with which . . . vehicle[s] can become disabled or involved in . . . accident[s] on public highways' often requires police to perform noncriminal 'community caretaking functions,' such as providing aid to motorists." Caniglia v. Strom, 593 U.S. 194, 199 (2021) (quoting Cady v. Dumbrowski, 413 U.S. 433, 441 (1973)). It is not clear whether the community caretaker function would apply under Seventh Circuit law—that court has "confined the doctrine to automobile searches," which did not happen here. Sutterfield, 751 F.3d at 554. But Michalsen did not have to be performing a "community caretaker" function for the court to conclude that any seizure that occurred was reasonable. Michalsen interacted with the plaintiffs for, at most, sixteen minutes. He did not touch them, did not demand that they get out of the truck, did not yell at them, did not threaten to arrest them. At most, he was brusque and rude, making the plaintiffs feel that they were being treated like wrongdoers instead of like stranded people who needed

59

help. That conduct is regrettable, but it does not render any seizure—even if a seizure had occurred—unreasonable.

The court will grant summary judgment in favor of the defendants on Count Three—the plaintiffs' unreasonable seizures claim.

### 2. *Unreasonable Searches: Count Four*

"A search compromises the individual interest in privacy while a seizure deprives the individual of dominion over [their] person or property." Horton v. California, 496 U.S. 128, 133 (1990). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984).

### a. Parties' Arguments

The defendants assert that the plaintiffs had no reasonable expectation of privacy in their identifying information and that government interests in officer and highway safety outweigh minimal intrusion into the plaintiffs' privacy interests. Dkt. No. 68 at 26. They argue that although law enforcement may not compel the production of identification from a passenger absent reasonable suspicion, officers remain free to ask for it. Id. And they argue that if the passenger voluntarily provides his license, it is a consensual encounter that implicates no Fourth Amendment interests. Id. The defendants contend that because the plaintiffs could have refused Michalsen's request yet chose to give him their licenses—regardless of their subjective beliefs about escalating the situation—a search did not occur. Id. at 27. The defendants argue that running a warrant check is an ordinary inquiry which is negligibly burdensome

60

to individual privacy interests and does not measurably extend the duration of the encounter. <u>Id.</u> at 27-28.

The plaintiffs respond that there is a genuine dispute of material fact over whether they consented to produce their licenses and whether Michalsen "insisted" that they produce their identification without reasonable suspicion. Dkt. No. 76 at 7-8.

The defendants reiterate that Michalsen's inquiries were constitutionally permissible, ordinary inquiries justified by important government interests in officer safety and community caretaker functions. Dkt. No. 79 at 10.

b.  *Analysis*

The plaintiffs assert that Michalsen "compelled, and, therefore searched, Plaintiffs' driver's licenses and accessed their protected driver information for no legitimate law enforcement function." Dkt. No. 43 at 14, ¶ 80-81. A search occurs when police officers infringe on a reasonable expectation of privacy. <u>Jacobsen</u>, 466 U.S. at 113.

The court already has addressed, and rejected, the plaintiffs' argument that they were compelled to produce their licenses. As for their argument that their driver information was "protected," the Eleventh Circuit Court of Appeals has held that information in motor vehicle records is not the sort of information entitled to a constitutional right to privacy, and that an individual does not have a reasonable expectation that the information on one's driver's license is confidential or private. <u>Corbitt v. Sec'y of the Ala. Law Enforcement Agency</u>, 115 F.4th 1335, 1350-51 (11th Cir. 2024). The Ninth Circuit has held that a

law enforcement officer's check of someone's driver's license with radio dispatch was neither a search nor a seizure. In United States v. Diaz-Casteneda, 494 F.3d 1146, 1153 (9th Cir. 2007), the court explained:

> People do not have a reasonable expectation of privacy in their driver's license or state ID card (or the identification numbers contained by those documents) once they hand them over to police officers who legitimately ask for them. That is, there is no constitutional basis for complaint when the police properly obtain information located in a driver's license or state ID card, and then use it to access additional non-private (but inculpatory) information about the document's owner.

Id.

The plaintiffs have not presented evidence demonstrating that a reasonable person would not have felt free to refuse Michalsen's request or terminate the encounter. Nor have they presented evidence that under these circumstances, they had a reasonable expectation of privacy in the information on their licenses or in the warrants database. A reasonable jury could not conclude that Michalsen subjected the plaintiffs to an unreasonable search in violation of the Fourth Amendment. The court will grant summary judgment in favor of the defendants on Count Four—the plaintiffs' unreasonable searches claim.

### C. Prospective Injunctive Relief (Count Five)

The plaintiffs bring the claim for prospective injunctive relief against defendant Sheriff Eric Severson in his official capacity as the Waukesha County Sheriff. They allege that Severson was "aware that [Michalsen] violated the Fourth and Fourteenth Amendments [sic] of African Americans but has taken no action to date to correct it." Dkt. No. 43 at 15. The plaintiffs seek to

62

compel Severson "to implement and enforce constitutional policies and programs with respect to training, supervision, monitoring, and discipline that will eliminate suspicion-less searches and seizures and eliminate racial profiling by the [deputies]." Id. at 15-16.

The defendants argue that the plaintiffs are not entitled to prospective injunctive relief because they have not pled a Monell[9] claim or otherwise asserted that WCSO policies, training and practices are insufficient or unconstitutional. Dkt. No. 68 at 30. The defendants assert that if the plaintiffs were to prevail, declaratory relief would be sufficient because it is "the proper mechanism for ordering a litigant to abandon an unconstitutional practice" and so an injunctive relief would be duplicative. Id. at 30-31.

The plaintiffs concede "that their request for injunctive relief is contingent on the outcome of the claims against Deputy Michalsen." Dkt. No. 76 at 30 n.19. The court has concluded that the plaintiffs have not demonstrated Michalsen violated their Fourteenth or Fourth Amendment rights. That conclusion moots the plaintiffs' request for injunctive relief.

D.    Qualified Immunity

The defendants contend that they are entitled to qualified immunity. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity on a motion for summary

---

[9] Monell v. Dept. of Social Servs. of the City of New York, 436 U.S. 658 (1978).

judgment turns on whether the plaintiff has both "(1) alleged that the official committed acts violating a clearly established right and (2) adduced 'evidence sufficient to create a genuine issue as to whether the [official] in fact committed those acts.'" Balsewicz v. Pawlyk, 963 F.3d 650, 656 (7th Cir. 2020) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

Because the court is granting summary judgment to the defendants on the merits, it will not analyze their claim that they are entitled to qualified immunity. See Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

## V. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 67.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 25th day of November, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

64